# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: APRIL 27, 2017
NOT TO BE PUBLISHED

Supreme Court of Kentucky

FINAL

2016-SC-000179-MR

DATE 8/24/17 Kim Redmon, DC

TIMOTHY M. GOLDEN                                              APPELLANT

V.

ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE GREGORY M BARTLETT, JUDGE
NO. 14-CR-00499

COMMONWEALTH OF KENTUCKY                                        APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Appellant, Timothy M. Golden, appeals from a judgment of the Kenton Circuit Court convicting him of two counts of first-degree sodomy of a child under twelve and sentencing him to a total of forty years in prison.

As grounds for relief Appellant presents the following claims: (1) the presence of the alleged victim's guardian ad litem during the trial, acting in apparent collaboration with the prosecution, deprived Appellant of a fair trial; (2) the chief investigating officer impermissibly testified that he believed the allegations of the alleged victim; (3) the prosecutor improperly communicated with the alleged victim during cross-examination; (4) the trial court erroneously failed to grant a new trial based upon the post-trial discovery of exculpatory information from the diary of the alleged victim; (5) the prosecutor improperly

urged the jury to impose a harsh penalty for the purpose of sending a message to the victim; and (6) the cumulative effect of the foregoing errors deprived Appellant of a fair trial, and thus requires reversal of the judgment. For the reasons stated below we affirm the judgment.

## I. FACTUAL BACKGROUND

For several years, Appellant lived with his girlfriend and her two daughters, one of whom is Alison.[1] Alison, fifteen years old at the time of the trial, testified that when she was ten or eleven years old, Appellant blindfolded her and put his penis in her mouth. She further testified that on a different occasion, but also while she was ten or eleven, Appellant blindfolded her and then anally sodomized her with his penis. Alison's accusation was not corroborated by forensic or circumstantial evidence. Appellant denied any sexual contact with Alison.

## II. ANALYSIS

### A. The guardian ad litem's limited presence during the trial did not prejudice Appellant's rights.

Appellant contends that reversible error occurred because Alison's guardian ad litem (GAL), Amy Halbrook, was permitted to sit behind the prosecutor's table during the trial.[2] Halbrook had been appointed by the trial court as Alison's GAL after Appellant persuaded the trial court that a GAL to

---

[1] We use a pseudonym to protect the anonymity of the alleged victim.

[2] To be clear, while the parties refer to the GAL as having sat *at* the prosecutor's table during the trial, our review of the record indicates the GAL was seated before the bar in the courtroom directly behind the prosecutors who were seated *at* the prosecutor's table.

2

represent Alison's interests as a child-victim was necessary. During the pretrial proceedings leading up to trial, Halbrook sat directly at the prosecutor's table. She also filed a written response opposing Appellant's motion to introduce a prior accusation of sexual misconduct allegedly made by Alison.

At the commencement of the trial, the court introduced the attorneys to the jury. The trial court told the jury that Halbrook did not represent either the Commonwealth or the defense, but instead represented Alison. Throughout the trial, Halbrook sat directly behind the prosecutor's table. She did not sit *at* the prosecutor's table as she had done in the pretrial proceedings. For all bench conferences during the trial, Halbrook approached the bench with the prosecutors and defense counsel. She listened but did not speak. Halbrook also filed a response on behalf of Alison opposing Appellant's motion for a new trial.

Appellant never voiced any objection to the GAL's presence in the case. He concedes that his current complaint about the GAL's participation was not preserved for appellate review, but he asserts that error occurred for which he now seeks palpable error review.

> Under RCr 10.26, we may grant relief for an unpreserved error when the error is: (1) palpable; (2) affects the substantial rights of a party; and (3) has caused a manifest injustice. Manifest injustice requires showing a probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law, i.e., the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be shocking or jurisprudentially intolerable.

3

*Spears v. Commonwealth*, 448 S.W.3d 781, 791 (Ky. 2014) (internal quotations and citations omitted).

The Commonwealth argues that any error resulting from the GAL's involvement at the trial was invited by Appellant because he is the one who first insisted that a GAL should be appointed. The Commonwealth relies upon *Thornton v. Commonwealth*, 421 S.W.3d 372, 376-377 (Ky. 2013) (Under the "invited error" doctrine, "[b]ecause Appellant himself proposed the insanity instruction, which was ultimately given, his right to appellate review of the claimed instructional error was relinquished.").

Appellant's request for the GAL appointment did not invite the error that he now attacks on appeal. His complaint is not that the GAL was appointed; rather, his complaint is directed at the role undertaken by the GAL and tolerated by the trial court during the trial. Appellant's acquiescence, even his insistence, upon the appointment of a GAL cannot fairly be construed as acquiescence in the conduct of the GAL during the trial. He is not barred by the doctrine of invited error from seeking palpable error review.

In support of the claim that his trial was fatally tainted by the manner of the GAL's participation, Appellant relies upon *State v. Harrison*, 24 P.3d 936 (Utah 2001), as persuasive authority. *Harrison*, however, is easily distinguishable from this case because the GAL in *Harrison* did not act in the relatively passive role at trial that Halbrook did in this case. The GAL in

4

*Harrison* sat at counsel table with the prosecutor and actually questioned witnesses and voiced objections.

The Supreme Court of Utah found considerable fault with the GAL's actions in *Harrison*, holding as follows:

> Permitting the guardian ad litem to sit at counsel table was error. To permit the guardian ad litem to sit at counsel table in a criminal trial and act like a second prosecutor, wearing the cloak of authority of an employee of the courts, having been appointed by the trial court to the role, dangerously erodes the defendant's presumption of innocence. The guardian ad litem's role does not extend to this degree of 'protecting' the interests of the child by assisting in the punishment of the alleged perpetrator of the crime against the child victim.

24 P.3d at 945.

We agree generally with the Utah Court's denunciation of the zealous prosecutorial role performed by the GAL in *Harrison* whose ward, like Alison, was not a party in the case but was instead a witness for the prosecution. A GAL's duty to "represent the [child victim's] interests where needed"[3] does not empower the GAL to assume an active role in the prosecution of the alleged perpetrator of harm to the child.

Halbrook represented the interests of an individual who was only a witness in the case, albeit an important one. For a variety of reasons, many witnesses in criminal cases have attorneys nearby to protect their interests; the

---

[3] KRS 26A.140(1)(a) provides in pertinent part: "Trained guardians ad litem or special advocates, if available, shall be appointed for all child victims and shall serve in Circuit and District Courts to offer consistency and support to the child and to represent the child's interests where needed."

5

appropriate role of the child-victim's GAL in this situation is the same. We do not ordinarily permit those attorneys to sit before the bar in the courtroom and participate in the trial.

We question whether Halbrook should have been seated before the bar and behind trial counsel and introduced to the jury as if she were a trial participant, but we cannot say that Appellant's right to a fair trial was in any way affected by her conduct during the trial. Halbrook did not sit at counsel table. She did not make an opening statement or a closing argument, she did not examine or cross-examine witnesses, and she did not make objections to evidence during the trial. Her zealous protection of Alison's interests came nowhere near the robust prosecutorial role of the GAL in *Harrison*.

We are satisfied that, despite Halbrook's presence before the court during the trial, her relatively passive role before the jury did not prejudice Appellant's right to a fair trial. Under the circumstances before us, any error in Halbrook's courtroom presence falls well short of creating a "manifest injustice," the palpable error standard required to reverse the judgment.

## B. The detective's testimony did not bolster the victim's credibility.

Detective Bradbury interviewed Appellant as part of his investigation of Alison's accusations. He also testified at the trial. Appellant contends that reversible error occurred when Bradbury's testimony impermissibly bolstered Alison's allegations. Detective Bradbury testified immediately after Alison. The prosecutor questioned Bradbury about the "Reid Technique" which he uses in criminal investigations for interrogating suspects. He described the Reid

Technique as a "highly effective tool and method . . . for eliciting statements from suspects." Bradbury explained further that, pursuant to the Reid Technique, the first part of the interview was a "behavior analysis" during which he determined if the suspect is being honest or deceitful.

Appellant objected to that line of questioning and expressed his concern that Bradbury would state an opinion, "based upon his training and experience," regarding Appellant's veracity, which is impermissible. *Ordway v. Commonwealth*, 391 S.W.3d 762, 789 (Ky. 2013) ("With few exceptions, it is improper to require a witness to comment on the credibility of another witness. A witness's opinion about the truth of the testimony of another witness is not permitted.")(Citations omitted). The trial court confirmed that Bradbury could not state his opinion on whether anyone had been truthful or not. The prosecutor agreed, saying, "I promise we are not going there."

Shortly thereafter, the prosecutor asked Bradbury how many of the child abuse cases he had investigated led to criminal charges. The relevance of that information is doubtful and the trial court sustained Appellant's objection, but not before Bradbury responded, "Less than half." Appellant sought no further relief on this issue. On redirect examination, the following exchange occurred:

**Prosecutor:** For my own clarification, you said your goal is to get confessions.

**Bradbury:** It is. When we believe something has happened, that is absolutely our goal.

**Prosecutor:** What if you believe it didn't happen?

7

**Defense Counsel:** Objection to his belief, Judge.

**Trial Court:** What was the question?

**Defense Counsel:** What do you do if you believe it didn't happen?

**Prosecutor:** Is that our sole goal, in conducting interviews and interrogations?

**Bradbury:** It is, to get to the truth.

**Trial Court:** Anything else?

**Defense Counsel:** That's not what you said earlier, you said "confession," now you said "to get to the truth," because after all, he – note the inference – he's not telling the truth. You said "confession;" everything you said was [inaudible] to get a confession.

**Bradbury:** When the confession's the truth, yes.

**Defense Counsel:** I object to his belief, I'm asking that, I think it's out of his training.

**Trial Court:** He says the practice is, if he believes something, he wants to get to that point, I think that's what he said.

**Defense Counsel:** Judge . . . .

**Trial Court:** It's not an expression on the case.

**Defense Counsel:** When . . . It's not?

**Trial Court:** Next question.

From the foregoing dialogue, Appellant argues that Bradbury was allowed to testify that he believed Alison's charges against Appellant. We agree that "[i]t is well-settled that a witness cannot vouch for the truthfulness of

8

another witness." *Hoff v. Commonwealth*, 394 S.W.3d 368, 376 (Ky. 2011) (citing *Stringer*, 956 S.W.2d at 288). "It is also well-established that a witness may not vouch for the credibility of another witness's out-of-court statements, including the out-of-court statements of a child alleged to be a victim of a sex crime." *Hall v. Commonwealth*, 862 S.W.2d 321, 323 (Ky. 1993) (citing *Hellstrom v. Commonwealth*, 825 S.W.2d 612, 614, 617 (Ky. 1992)).

However, the premise of Appellant's argument is simply not supported by the record. An examination of transcriptions he cites discloses that Bradbury did not vouch for the truthfulness of Alison's testimony or for her out-of-court statements. He did not characterize any statements or testimony of Appellant as false. Regardless of whether the objective of Bradbury's interview was to get a confession or to get the truth, he never answered the question about what he did when he did not believe a crime happened as the victim stated. We see nothing in Bradbury's testimony that opines on the credibility of either Appellant or Alison, and so we remain unpersuaded that Appellant is entitled to relief on this issue.

## C. The trial court's finding that the prosecutor did not improperly signal answers to the witness is supported by substantial evidence.

Appellant next contends that he is entitled to a new trial because during Alison's cross-examination by defense counsel, the prosecutor coached her with signals and gestures. A local attorney, Joseph Holbrook, watched part of the trial and saw defense counsel's cross-examination of Alison.[4] Holbrook

---

[4] Holbrook was not directly involved with the case but had collaborated on cases with defense counsel in the past and had occasionally conferred with defense

noticed what he perceived to be signals from the prosecutor to Alison, and Alison seemingly responding with answers corresponding to the prosecutor's signals. Holbrook alerted defense counsel by texting this observation to co-counsel seated at the defense table. Based upon Holbrook's message, defense counsel approached the bench and informed the trial court of the prosecutor's actions. The trial court responded, "Let's not do that ["that" apparently meaning signal the witness], if it's happening. There can be no reaction." Appellant requested no additional relief at that time.

After the verdict, Appellant raised the issue in a motion for a new trial, and an evidentiary hearing was held. Appellant reiterated the allegation that in response to some of defense counsel's questions, Alison averted her gaze to the prosecutor's table and that the prosecutor responded with a head nod or gesture to prompt Alison's answer. Holbrook's affidavit, attached to the motion, stated in part:

> It appears as though the Prosecutor telegraphed answers and/or responses to the alleged victim during this line of questioning because: (1) the alleged victim hesitated in answering the questions; (2) she would then look at the Prosecutor shaking her head; and (3) then she responded to the question.

Holbrook testified at the hearing on the motion. He said that three times he saw the prosecutor signal Alison with a head shake or nod, and each time

---

counsel about jury instructions, and had done so in this case. He further testified that his relationship with defense counsel did not influence his testimony.

10

Alison responded with an answer conforming to the head shake. Holbrook noted that defense counsel conducting the cross-examination had her back to the prosecutor and so was unaware of the gestures until he alerted Appellant's co-counsel.

Appellant's brother, Sylvester Golden, also attended the trial, sitting in the second row. He saw the prosecutor nod or shake her head to indicate "yes" or "no" in response to defense counsel's questioning of Alison. For example, Sylvester testified that when defense counsel asked Alison if she had reviewed her earlier statements to the police, Alison hesitated and looked toward the prosecutor. The prosecutor shook her head, signifying "no." Sylvester testified that while Alison was under cross-examination, the prosecutor was writing, clicking her pen, and shaking her head.

The prosecutor denied that she had signaled responses to the victim. She said that while her witnesses are being cross-examined, she generally tries to look at the defense counsel and take notes for her redirect-examination. She said she did not recall shaking her head, but if she did, it would have been an involuntary movement and not a signal to Alison. With no elaboration or detailed findings of fact, the trial court denied Appellant's motion for a new trial, concluding simply that it had "no merit."

Of course, it should go without saying that no one in the courtroom during a trial, especially the attorneys trying the case, may signal or otherwise communicate answers to a testifying witness, whether it be for the purpose of guiding the testimony or lending encouragement and moral support. *Sharp v.*

11

*Commonwealth*, 849 S.W.2d 542, 546-547 (Ky. 1983) (A mistrial was required as a result of a bystander's gestures to a child witness and the communication of the substance of some testimony from the courtroom to one or more of the separated witnesses; a witness may not receive encouragement, approval, and comfort at the time her credibility is being assessed by the jury). In light of a prosecutor's additional ethical duties to seek justice and assure that a defendant receives a fair trial, it is highly improper for a prosecutor to engage in such conduct.[5] If that did occur, the failure of the trial court to address the issue and cure any resulting prejudice would be a significant error in the proceedings.

Our review is hampered by the lack of detailed findings of fact concerning this issue. The trial court's conclusion that Appellant's concern had "no merit" unmistakably implies a finding that the improper communication to the witness did not occur. Presumably, if such signaling occurred, then the issue would obviously have had "merit" even if it was ultimately found to be harmless. Accordingly, we construe the ambiguous record as a finding of the trial court that signaling did not occur. We will disturb a trial court's finding of fact only if it is clearly erroneous; a finding is clearly erroneous when it not supported by substantial evidence. CR 52.01. Regardless of how it appeared to Holbrook and Sylvester Golden, the prosecutor unequivocally denied

---

[5] SCR 3.130(3.8) comment (1): "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."

12

signaling to the witness. That testimony is sufficient to support the trial court's implied finding that no signaling occurred. We therefore affirm the trial court's holding on this issue.

## D. The newly-discovered diary entry did not warrant a new trial.

Appellant argues that the trial court erred by failing to grant his motion for a new trial based upon the post-trial discovery of exculpatory evidence, specifically, a page allegedly torn from Alison's diary. The diary page was ostensibly written some three months after Appellant's trial. The diary entry, apparently in Alison's handwriting, states the following:

> I can't believe my mom asked me to get [Appellant] out of jail. I'm glad he's in jail, I hate him. He took my father and mother away. I feel like they both have to pay for what's happened to me and my sisters and I did it. He's in jail and my mom can't see him no more and they can't keep me from Josh, so I think it's good this way even if he didn't do shit.

The Commonwealth challenged the authenticity of the diary page. To establish its authenticity, the detached page was sent with the rest of the diary to the FBI laboratory in Quantico, Virginia, for handwriting analysis. The results of that analysis are not included in the record; nor is the diary or the detached page.

Appellant's motion asserted that this newly-discovered diary entry is evidence revealing Alison's motive for falsely accusing Appellant. Appellant points out that the principal weakness in his defense at trial was his inability

to establish Alison's motive to lie. The diary entry, he contends, cured that deficiency, casting light on the family's dynamics and Alison's motive to lie.

The trial court side-stepped the question concerning the authenticity of the entry, and instead denied Appellant's motion upon the grounds that, even if genuine, the diary entry did not exculpate Appellant by revealing a motive for Alison to lie about him. The trial court found that Alison's resentment toward her mother and Appellant was known before the trial, and that her apparent statements that she was "glad [Appellant] is in jail, I hate him" and "He's in jail and my mom can't see him no more and they can't keep me from Josh, so I think it's good this way even if he didn't do shit" were not exculpatory.

A new trial can be granted "for any cause which prevented the defendant from having a fair trial, or if required in the interest of justice." RCr 10.02(1). "[W]hether to grant the motion for a new trial is always within the trial court's sound discretion and is entitled to a great deal of deference by an appellate court." *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 72 (Ky. 2010). "[F]or newly discovered evidence to support a motion for new trial it must be of such decisive value or force that it would, with reasonable certainty, have changed the verdict or that it would probably change the result if a new trial should be granted." *Foley v. Commonwealth*, 425 S.W.3d 880, 886 (Ky. 2014) (internal quotations and citations omitted).

Appellant construes the diary statement that "even if he dident [sic] do shit I am glad he is in jail," as Alison's admission that Appellant did not sodomize her and that she had fabricated the charges. The trial court read it

14

differently. The alternative interpretation adopted by the trial court was that Alison hated Appellant because he broke up her parents, and that *even if* he had not sexually abused her, she would still be glad he is in jail. In light of this equally plausible interpretation of the newly discovered diary entry, the evidence is not "evidence of such decisive value or force that it would with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted." Accordingly, the trial court did not abuse its discretion in denying Appellant a new trial based upon this issue.

## E. The prosecutor's "send a message" argument was harmless error.

Appellant contends that he was denied a fair penalty phase trial because the prosecutor urged the jury to impose a harsh sentence as a message of support for the child-victim. Specifically, the following occurred in his penalty phase closing arguments:

**Prosecutor:** I believe these were two separate acts; I believe the time should run consecutively. I believe he deserves 25 years for each of them for a maximum of 50 years. His parole eligibility will be 20. *And that will send a message to that child . . . .*

**Defense Counsel:** Objection.

**Trial Court:** Overruled.

At a later bench conference, defense counsel argued that the prosecutor impermissibly made a "send a message argument." The trial court rejected the argument by distinguishing the prosecutor's comment to "send a message to

the *victim*" from the long line of cases condemning arguments that "send a message to the *community.*"

Appellant correctly notes that we have condemned the use of "send a message to the community" arguments based upon the concern that such arguments might encourage a jury to render a guilty verdict simply "to satisfy the community expectation." *Ordway*, 391 S.W.3d at 797.

In *Cantrell v. Commonwealth*, we reaffirmed our condemnation of the use of a "closing argument to shame jurors or attempt to put community pressure on jurors' decisions." But we also recognized that in the penalty phase, a prosecutor could properly present an argument narrowly channeled to encourage the jury to "send a message" to the defendant and others in the community inclined toward similar criminal behavior. Such an argument is proper because deterrence is an important objective of criminal sentencing. 288 S.W.3d 291, 299 (Ky. 2009).

We find no similar justification for the argument that a jury should use its sentencing authority to "send a message to the victim." Our decisions have made clear the impropriety of closing arguments that "urge[] the jury to consider public opinion" and "correspondingly appl[y] pressure on the jury to satisfy the community expectation." *Ordway*, 391 S.W.3d at 797. Urging the jury to fix a sentence that pleases the victim, vindicates her accusations, or satisfies her perceived plea for justice, is very much akin to the impermissible arguments for sending similar messages to the community at large. Urging the jury to "send a message," apparently of solidarity and support, to the victim is

16

essentially the same as shaming or pressuring the jury to impose a severe sentence to assuage the feelings of a sympathetic child victim. This type of argument remains prohibited under *Cantrell* and *Ordway.*

Jurors should be encouraged to be detached and dispassionate arbiters of the facts derived from the evidence, dispensing justice without favor or sympathy. Encouraging the jury to "send a message to the victim" is rhetoric that invites the jury to step outside its proper role. The jury's purpose is not to "send a message" to the victim and it is not proper for the prosecutor to urge the jurors to do so.

As explained in *Brown v. Commonwealth,* 313 S.W.3d 577, 595 (Ky. 2010), "preserved evidentiary and other non-constitutional errors will be deemed harmless under RCr 9.24 and *Kotteakos v. United States,* 328 U.S. 750 (1946), if we can say with fair assurance that the judgment was not . substantially swayed by the error." *Accord Winstead v. Commonwealth,* 283 S.W.3d 678, 689 (Ky. 2009); *Ordway* 391 S.W.3d 774 (Ky. 2013). Upon review of the specific comment at issue in context with the entire closing argument, we are satisfied that the prosecutor's brief and passing comment could not have substantially swayed the sentencing verdict, and thus we find the error to be harmless.

## F. Reversal is not required due to cumulative error.

Finally, Appellant requests that we overturn his convictions on the grounds of cumulative error. *See Funk v. Commonwealth,* 842 S.W.2d 476, 483 (Ky. 1992) (stating that "the cumulative effect of the prejudice" from

17

multiple harmless errors can require reversal). This doctrine recognizes that "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). As described above, Appellant's trial was not error free; nevertheless, we are persuaded that the errors that occurred considered individually and in their cumulative effect did not render the trial fundamentally unfair. Accordingly, Appellant is not entitled to relief under the cumulative error doctrine.

### III.    CONCLUSION

For the foregoing reasons, the judgment of the Kenton Circuit Court is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Erin Hoffman Yang
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Leilani K.M. Martin
Assistant Attorney General

18